*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0179p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANGELA GARCIA,

>    *Petitioner-Appellant,*

>    *v.*

No. 05-3856

PATRICIA ANDREWS, Warden,

>    *Respondent-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 04-00612—Paul R. Matia, District Judge.

Argued: April 24, 2007

Decided and Filed: May 17, 2007

Before: SILER and GILMAN, Circuit Judges; ZATKOFF, District Judge.[*]

---

**COUNSEL**

**ARGUED:** David L. Doughten, Cleveland, Ohio, for Appellant. Elizabeth T. Scavo, OFFICE OF THE OHIO ATTORNEY, Columbus, Ohio, for Appellee. **ON BRIEF:** David L. Doughten, Cleveland, Ohio, for Appellant. Stephen P. Carney, Gene Crawford, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Angela Garcia was convicted in an Ohio state court of aggravated murder, aggravated arson, and insurance fraud in connection with the deaths of her two young daughters as a result of a fire that she set in her home in order to collect insurance proceeds. She was sentenced to life imprisonment with the possibility of parole after 20 years. After exhausting her direct appeals in state court, Garcia petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising seven assignments of error. The district court denied the petition, but granted a Certificate of Appealability on the issue of whether the trial court's failure

---

[*]The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

to investigate Garcia's allegations of juror misconduct warranted a new trial. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Garcia was convicted in the Court of Common Pleas of Cuyahoga County, Ohio on charges of (1) aggravated murder of a person under thirteen years old, in violation of Ohio Rev. Code Ann.§ 2903.01(C); (2) aggravated murder, in violation of Ohio Rev. Code Ann. § 2903.01(A); (3) murder, in violation of Ohio Rev. Code Ann. § 2903.02; (4) aggravated arson, in violation of Ohio Rev. Code Ann. § 2909.02; and (5) insurance fraud, in violation of Ohio Rev. Code Ann. § 2913.47. After several of the counts were merged together for sentencing purposes, Garcia received a sentence of life imprisonment with eligibility for parole after 20 years. The Ohio Court of Appeals described the basic facts of the case as follows:

> On the evening of November 20, 1999, Garcia and her two daughters, Nyeemah, three years old, and Nijah, aged two, were at their home located on Harvard Avenue, Cleveland, Ohio. Before night's end, the home was destroyed by fire, the two young girls dead from smoke inhalation, and Garcia the only survivor. Though the fire was initially ruled accidental by the Cleveland Fire Department, one month later that conclusion was changed to fire by arson after investigators conducted an in-depth investigation as to its cause and origin. The fire occurred on a Saturday and the remaining parts of the house were razed by the city on Monday, two days after the fire. Photographs of the scene, inside and outside the house, were taken either immediately after the fire had been extinguished or the next day, Sunday.
>
> In February 2000, Garcia was indicted for having intentionally set the fire in order to collect insurance proceeds and for causing the death of her children as part of that plan. At trial, Garcia maintained the fire was accidental and that she tried to save her girls, but could not because of the fire's intensity.

Garcia's first trial ended in a mistrial after the jury found her guilty on the insurance-fraud count but was unable to reach a verdict as to the remaining counts of the indictment. The Court of Common Pleas held Garcia's sentencing for the count of insurance fraud in abeyance until after her retrial. Garcia's second trial also ended in a mistrial because the jury could not reach a verdict on the murder and arson counts. Her third trial commenced in late May of 2001. Jury deliberations began on June 3, 2001. The next morning, the trial judge received the following note signed by jury foreman William McGary, with two other jurors listed as "concurring":

> Your Honor, because I work in the immediate area of the burnt out home I feel grave concern for me and my family's personal safety. The family of the defendant owns property in the neighboring area and can easily identify me, especially since we are in the same business. The propensity for contact, (visual or physical,) is highly likely. It is my feeling as well as those of my fellow jurors, that I be removed from the jury.

Although the letter states that Juror McGary was in the same business as the defendant's family, the record is devoid of any evidence that McGary knew Garcia or her family personally. A second note was later delivered to the trial court in which the jurors requested a change in their

foreman.  After the trial court received the first note, it convened both the prosecution and defense counsel in chambers to give each side an opportunity to respond to the note.  The defense argued that the foreman did not reveal during voir dire his knowledge of the defendant's family or that he was in the same business as the defendant's family.  Arguing that the jury had been tainted, defense counsel asked for an immediate mistrial or, in the alternative, for the trial court to voir dire the jury immediately to determine the existence and extent of any taint.

The trial court denied the motion for a mistrial and the request for voir dire.  Instead, it sent a note to the jury instructing them that they must continue to deliberate.  Defense counsel then moved for the court to sequester the jury and conduct an immediate postverdict voir dire.  The trial court denied the motion after concluding that a postverdict voir dire is precluded under Ohio law.  A few minutes after the judge called counsel into chambers to announce the ruling on the postverdict voir dire motion, the jury returned a verdict of guilty on the murder and arson counts.

Garcia appealed her conviction, raising 11 assignments of error, including the one at issue.  The Ohio Court of Appeals affirmed Garcia's conviction.  Garcia appealed to the Ohio Supreme Court, which dismissed her appeal as not involving a substantial constitutional question.  Having exhausted all of her direct appeals in state court, Garcia declined to pursue postconviction relief within the state system and instead filed a petition in the federal district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  She raised seven claims for relief in her petition.

The designated magistrate judge issued a Report and Recommendation in December of 2004, concluding that Garcia should be granted habeas relief on her fourth claim of error, which Garcia had described as follows:

> During deliberations, [a] juror brought to the court's attention allegations of [a juror's] misconduct.  The trial court refused to inquire as to the nature of the misconduct and the extent to which the deliberations might have been contaminated. . . .  The failure of the trial court to dismiss the juror, or in the alternative, to hold an evidentiary hearing was in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

Disagreeing with the magistrate judge's Report and Recommendation, the district court denied Garcia's petition on all grounds.  With respect to the juror-misconduct claim, the district court concluded that because there was no evidence of any extraneous influence on or contact with Juror McGary, the trial court's refusal to grant a mistrial or conduct a voir dire to investigate potential juror taint was not "contrary to clearly established federal law as established by the Supreme Court."  The district court, however, issued a Certificate of Appealability as to this issue, and this court denied Garcia's motion to expand the Certificate.  Garcia timely appealed.

## II.  ANALYSIS

### A.     Standard of review

We review the legal basis for a district court's dismissal of a habeas petition de novo.  *Davis v. Coyle*, 475 F.3d 761, 766 (6th Cir. 2007). The factual findings underlying the district court's analysis will not be set aside unless those findings are clearly erroneous.  *Id.*  Because Garcia filed her petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), that statute governs our review of this case.  A writ of habeas corpus may not be granted under AEDPA for any claim that was adjudicated on the merits in state court unless the adjudication of that claim

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §§ 2254(d)(1)-(2).

In applying AEDPA, we look to the last state-court decision on the merits, which in this case is the decision of the Ohio Court of Appeals. *See Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006). The *Dyer* court further explained this court's scope of review under AEDPA:

> A state-court decision is considered contrary to federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.
>
> . . .
>
> The application of federal law is unreasonable where the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. When assessing unreasonableness, a federal habeas court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable. Factual findings made by the state court, moreover, are presumed correct in the absence of clear and convincing evidence to the contrary.

*Id.* at 284 (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)) (brackets and quotation marks omitted). If "a state court does not squarely address the claim but engages in what resembles the proper constitutional analysis," this court will similarly not issue the writ unless it determines "that the state court decision was contrary to, or an unreasonable application of, federal law." *Dyer*, 465 F.3d at 284.

## B.    Failure to conduct a *Remmer* hearing

Garcia argues that the state trial court's failure to hold a hearing to investigate potential juror misconduct violated her right to have her case decided by an impartial jury. She contends that in refusing to hold a hearing, the trial court was trying to avoid a mistrial by not allowing Garcia the opportunity to prove that her jury had been impermissibly tainted. With respect to this claim, the Ohio Court of Appeals concluded as follows:

> On the record before us, there is nothing to indicate that the foreman's or other jurors' concerns about safety tainted their verdict. To the contrary, the verdict forms show that a verdict had already been reached before the jury replaced the foreman. Indeed, if the foreman's vote was based on his personal concern for safety, then a vote of not guilty would be expected. That was not his vote, however. Absent evidence of an improper outside influence and

resulting bias, we do not find that Garcia was denied a fair trial. Garcia's fourth assignment of error is overruled.

*State v. Garcia*, No. 79917, 2002 Ohio App. LEXIS 4362, at *30 (Ohio Ct. App. Aug. 15, 2002).

The controlling case in this area of the law is *Remmer v. United States*, 347 U.S. 227 (1954). In *Remmer*, the petitioner discovered after the jury had returned a guilty verdict that an unnamed person had communicated with a juror during the trial and had "remarked to him that he could profit by bringing in a verdict favorable to the petitioner." 347 U.S. at 227. The juror who had been contacted by this third party eventually became the jury foreman. After the juror reported the incident to the judge, the judge informed the prosecutor and the Federal Bureau of Investigation (FBI). The FBI investigated the incident and delivered its report to the judge. Neither the petitioner nor his attorney were informed of the incident. They learned of it only through newspaper accounts published after the jury's verdict had been returned.

The Supreme Court remanded the case to the district court "to hold a hearing to determine whether the incident complained of was harmful to the petitioner, and if after [a] hearing it is found to have been harmful, to grant a new trial." *Id*. at 230. It also determined that

> [i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

*Id*. at 229. The Court held that this presumption is not conclusive, but that the government bears a heavy burden to establish that any contact made with a juror "was harmless to the defendant." *Id*.

In a later case discussing the interplay between Rule 606(b) of the Federal Rules of Civil Procedure and a defendant's Sixth Amendment right to a fair trial, the Supreme Court reiterated that an evidentiary hearing delving into allegations of juror misconduct is required only where "extrinsic influence or relationships have tainted the deliberations." *Tanner v. United States*, 483 U.S. 107, 120 (1987) (holding that a postverdict evidentiary hearing into allegations of drug and alcohol use by jurors during the trial was not required under the Sixth Amendment because "juror intoxication is not an 'outside influence' about which jurors may testify to impeach their verdict"). Rule 606(b) "is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to *extraneous* influences." *Id*. at 121 (emphasis added).

The Ohio Court of Appeals found that no evidence of extraneous influence was shown in the present case, and therefore held that Garcia was not denied a fair trial. *State v. Garcia*, 2002 Ohio App. LEXIS at *30. Garcia has not shown that this conclusion is contrary to or an unreasonable application of clearly established federal law.

The principal case upon which Garcia relies in support of her contention that a *Remmer* hearing was required is *Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999), a case that we find inapposite. In *Nevers*, the defendants were two white Detroit police officers convicted of beating an African-American suspect to death. *Id*. at 354-55. The case received heavy media coverage, similar to the then-recent Rodney King beating in Los Angeles. *Id.* at 356. Near the end of the case, the trial court provided the jury with several movies for entertainment, including *Malcolm X*, which begins with footage of the Rodney King beating as well as a "racially provocative and highly inflammatory speech by Malcolm X." *Id*. The trial court denied the defendants' motion for a mistrial on the basis of the movie. *Id*.

After the guilty verdict was returned, the *Nevers* defendants presented several affidavits from jurors contending that other extraneous information had reached the jury during the trial and deliberations, including the allegation that the defendants had been involved in an undercover unit with a reputation for harassing young black men. *Id*. at 357. A member of the jury had further learned from news reports that the city was preparing for a potential riot in the event of an acquittal. *Id*. at 369. This court held that Nevers and his codefendant were entitled to an evidentiary hearing to have an opportunity to demonstrate "with specificity" that the jury was impermissibly tainted. *Id*. at 374. "When a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury, due process requires that the trial court take steps to determine what the effect of such extraneous information actually was on that jury." *Id*. at 373.

No such extrinsic influence exists in the present case. Juror McGary's note referenced his own subjective fear based on the fact that he worked in the area where the Garcia family owned property and that he was "in the same business." The fact that two other jurors signed the note indicates that McGary discussed his fear with the other jurors. There is no evidence in the record, however, that there was any outside influence on any of the jurors at any point during either the trial or jury deliberations.

This court has defined "an extraneous influence on a juror [as] one derived from specific knowledge about or a relationship with either the parties or their witnesses." *United States v. Herndon*, 156 F.3d 629, 635 (6th Cir. 1998). Examples of extraneous influence include "prior business dealings with the defendant, applying to work for the local district attorney, conducting an out of court experiment, and discussing the trial with an employee." *United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005) (denying postconviction relief from a federal conviction for bank robbery where the petitioner argued that Owens was entitled to a *Remmer* hearing because one of the jurors passed a note to the judge expressing the juror's discomfort with Owens for "staring at her") (citation and quotation marks omitted). None of the examples set forth in *Owens* are analogous to a juror simply expressing his subjective fear as in the present case.

Another case cited by Garcia, *United States v. Davis*, 177 F.3d 552 (6th Cir. 1999), is also distinguishable despite some surface similarities. As in the present case, one of the *Davis* jurors (Juror Estes) sent a note to the judge asking to be excused from further service. *Id*. at 556. Moreover, Juror Estes based his fear in part on the fact that he lived in the same area as the defendants and had "operated a used car business that catered to individuals in a section of town heavily populated by minority citizens." *Id*. But the juror's fear in *Davis* was primarily based on the fact that he had previously done business with some of the defendants, and that he had heard from one of his employees during the course of the trial "that members of the community were already aware of Estes's jury service and were discussing his role in the proceedings." *Id*. This court remanded for a *Remmer* hearing, reasoning as follows:

> Given the fact that Estes was clearly motivated by fear of retaliation from the defendants, their families, and their acquaintances, *the fact that the information that prompted the fear was provided by an extraneous source*, and the fact that a number of jury members openly agreed that a person in Estes's predicament should seek to be removed from the panel, such further inquiry seems not only appropriate, but necessary to ensure the impartiality of the jury.

*Id*. at 557 (emphasis added).

The extraneous contact from the juror's employee in *Davis* is what distinguishes that case from the one before us. To be sure, the jurors here should not have been discussing Juror McGary's

subjective fear of reprisal even in the absence of an extraneous source, but the potential harm to Garcia is too attenuated to warrant habeas relief. This is especially so because, as the Ohio Court of Appeals recognized, one would have expected a vote of *not guilty* if Juror McGary was concerned about his personal safety. The fact that Juror McGary and all of the other jurors instead voted to convict Garcia indicates the lack of a due process violation.

Moreover, how we would apply our own Sixth Circuit precedents does not guide the analysis in the present case. *See Carroll v. Renico*, 475 F.3d 708, 712 n.3 (6th Cir. 2007) ("Thus, while this Circuit in direct appeals may require more stringent procedures, United States Supreme Court precedent guides our review of state habeas petitions."). We find no Supreme Court precedent that requires a *Remmer* hearing on the facts before us. The Ohio Court of Appeals, therefore, did not engage in an unreasonable application of clearly established federal law as determined by the Supreme Court or reach a result contrary to that law. *See Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006).

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.