*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0305p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DENNIS MICHAEL, et al.,

        *Plaintiffs-Appellants,*

    *v.*

MARGARETTE GHEE, Chairperson, Ohio Adult
Parole Authority, et al.,

        *Defendants-Appellees.*

No. 06-3595

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 01-07436—James G. Carr, Chief District Judge.

Argued: June 1, 2007

Decided and Filed: August 10, 2007

Before: MOORE and GRIFFIN, Circuit Judges; McKINLEY, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Leonard W. Yelsky, YELSKY & LONARDO, Cleveland, Ohio, for Appellants. Todd R. Marti, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellees. **ON BRIEF:** Leonard W. Yelsky, Norman L. Sirak, YELSKY & LONARDO, Cleveland, Ohio, for Appellants. Todd R. Marti, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellees.

---

**OPINION**

---

    GRIFFIN, Circuit Judge.  Plaintiffs, inmates in Ohio correctional facilities who were sentenced prior to Ohio's enactment of a revised sentencing system on July 1, 1996, appeal the district court's order granting defendants' motion for dismissal and for summary judgment. Plaintiffs argue that the district court erred in dismissing their state law claims, and in entering summary judgment in favor of defendants on plaintiffs' claims arising under the Due Process, Equal Protection, and Ex Post Facto Clauses of the Constitution.  For the reasons set forth below, we affirm.

---

[*]The Honorable Joseph H. McKinley, Jr., United States District Judge for the Western District of Kentucky, sitting by designation.

1

I.

Under Ohio's former sentencing law, Ohio inmates were given an indeterminate sentence comprised of a minimum and a maximum sentence. An inmate became eligible for parole after serving his or her minimum sentence, minus credit for good behavior. Parole decisions were delegated to the Ohio Adult Parole Authority ("OAPA"). It determined when release was appropriate for each inmate. In 1995, Ohio adopted a new sentencing system for crimes committed after July 1, 1996. *See* OHIO REV. CODE § 5120 *et seq.* Under the new law, indeterminate sentences were abandoned in favor of fixed terms of incarceration determined by the defendant's presiding judge. The new system does not apply retroactively to Ohio inmates sentenced under the former sentencing scheme. OHIO REV. CODE § 5120.021(A).

In 1998, the OAPA adopted guidelines designed to guide the discretion of parole officers making release determinations for Ohio inmates sentenced prior to July 1, 1996. The guidelines are similar to the guidelines used by the United States Parole Commission, using two factors to determine how long a prisoner should be incarcerated before parole: (1) the seriousness of the inmate's crime, and (2) the "risk of reoffense," based on the inmate's prior criminal conduct and performance on probation and parole. The presumptive amount of time an inmate serves is determined by finding the intersection on a grid between the inmate's offense category and his or her risk of reoffense. Parole officials, however, retain discretion to depart from the guidelines, but may not retain an inmate beyond the maximum sentence. *See* OHIO REV. CODE § 2967.03 (describing the OAPA's broad discretionary powers).

Plaintiffs filed this lawsuit in the Lucas County (OH) Court of Common Pleas on July 20, 2001, challenging the OAPA's practices, procedures, and proceedings.[1] In their amended complaint brought pursuant to 42 U.S.C. § 1983, plaintiffs contend that the lack of retroactivity of the new sentencing scheme and the implementation of the 1998 guidelines violate the Ex Post Facto, Due Process, and Equal Protection Clauses of the Constitution, as well as various provisions of state law.

Defendants, various members of the OAPA, and the Ohio Parole Board (collectively "defendants" or "the State") removed this case to federal court. On February 1, 2006, the district court granted the State's motion for dismissal and summary judgment. The court held that 42 U.S.C. § 1983 does not provide for a cause of action for violations of state law and, accordingly, dismissed plaintiffs' state law claims pursuant to FED. R. CIV. P. 12(b)(6). The court entered summary judgment in favor of the State on plaintiffs' federal constitutional claims, holding that plaintiffs' due process claims fail for lack of a liberty interest, that plaintiffs' equal protection claims fail under a rational basis review, and that the Ex Post Facto Clause does not apply to the OAPA's adoption of the 1998 guidelines. This timely appeal followed.

II.

First, plaintiffs challenge the district court's dismissal of their four causes of action that arise under Ohio state law. The district court dismissed each of these causes of action for failure to state a claim, pursuant to FED. R. CIV. P. 12(b)(6), because 42 U.S.C. § 1983 does not provide relief for a violation of state law. In so holding, the district court relied on this court's opinion in *Huron Valley Hosp., Inc. v. City of Pontiac*, 887 F.2d 710, 714 (6th Cir. 1989). Plaintiffs dispute the district court's reliance on *Huron Valley*, and argue that the court's dismissal runs counter to the Supreme Court's holding in *Wilkinson v. Dotson*, 544 U.S. 74 (2005). Plaintiffs' arguments are without merit, and the district court's dismissal of claims one through four is affirmed.

---

[1]Although plaintiffs intended this case to be a class action lawsuit, their motion for class certification was still pending when the district court granted the State's motion for dismissal and summary judgment. Thus, before this court, plaintiffs must show that a genuine issue of material fact exists with regard to each named plaintiff.

In their first cause of action, entitled "Abuse of Discretion," plaintiffs claim that the new sentencing guidelines were never submitted to the Joint Committee on Agency Rule Review pursuant to OHIO REV. CODE § 111.15(D) and that the State did not satisfy the procedure for adopting the guidelines as set forth in OHIO REV. CODE § 119.03.

In their second cause of action, entitled "Arbitrary and Capricious Decision Making," plaintiffs cite OHIO ADMIN. CODE 5120:1-1-07, and claim that "[r]endering decisions without fully disclosing eligibility criteria is akin to deviating from fixed rules and rendering decisions predicated upon unknown rules. This practice constitutes arbitrary and capricious decision-making." Under this cause of action, plaintiffs claim further that Policy 501-36, which the OAPA adopted on December 22, 2000, and – argues plaintiffs – makes consideration of the factors set forth in OHIO ADMIN. CODE 5120:1-1-07(C) discretionary, contravenes OHIO REV. CODE § 2967.03.

In their third cause of action, entitled "Separation of Powers," plaintiffs claim that because the parole board has the discretion to retain inmates past the expiration of their minimum sentence date, the parole board exceeds the scope of its state constitutional powers.

In their fourth cause of action, entitled "Bad Faith," plaintiffs claim that the parole board has breached its duty to give every inmate a meaningful parole hearing. Plaintiffs contend that "[p]romulgating [the] New Guidelines and Policy 501-36 to extend the sentences of Old Law inmates, thereby extending their own careers and delaying the eventual demise of the Parole Board, constitutes an ulterior motive." Each cause of action was brought pursuant to 42 U.S.C. § 1983.

The district court properly dismissed these claims. "Section 1983 . . . authorizes courts to redress violations of 'rights, privileges, or immunities secured by the Constitution and [federal] laws' that occur under color of state law. 'The statute is thus limited to deprivations of federal statutory and constitutional rights. It does not cover official conduct that allegedly violates state law.'" *Neinast v. Bd. of Trs. of the Columbus Metro. Library*, 346 F.3d 585, 597 (6th Cir. 2003) (quoting *Huron Valley Hosp.*, 887 F.2d at 714). In the amended complaint, plaintiffs have invoked only state statutory authority for each of these claims.[2] On appeal, plaintiffs have not identified any federal law or constitutional provision that is implicated by these claims. In short, plaintiffs have not offered any recognized argument that the district court erred in construing these claims as state claims.

Nevertheless, plaintiffs argue that the district court's reliance on *Huron Valley* is misplaced. Plaintiffs contend that *Huron Valley* stands for the proposition that a plaintiff may properly challenge an established state procedure pursuant to 42 U.S.C. § 1983. Plaintiffs are correct that they may raise a challenge to an established state procedure pursuant to § 1983, but only to the extent that the challenge invokes federal statutory or constitutional rights. In *Huron Valley,* we noted explicitly that § 1983 may not be used as a vehicle to challenge "official conduct that allegedly violates *state* law." *Huron Valley*, 887 F.2d at 714. Thus, *Huron Valley* allows plaintiffs to raise their due process claim through § 1983; it does not provide that plaintiffs have stated a viable claim under § 1983 in their allegations of violations of Ohio state law.

Likewise, the Supreme Court's consideration of the revised Ohio parole procedures in *Wilkinson v. Dotson*, 544 U.S. 74 (2005), does not support plaintiffs' position. In *Dotson*, the Court held that state prisoners challenging the constitutionality of state parole procedures are not limited to seeking relief exclusively under the federal habeas corpus statutes, but may also file their

---

[2]Plaintiffs assert that the defendants' "arbitrary and capricious decision-making" also constitutes a violation of the Due Process Clause. However, plaintiffs have also included a separate due process cause of action that involves essentially the same conduct.

challenge pursuant to § 1983.  *Dotson*, 544 U.S. at 82.  However, *Dotson* involved federal constitutional challenges to the Ohio parole procedures only and is silent as to whether state prisoners may raise state statutory and constitutional claims under § 1983. *Id.* at 76.

Plaintiffs also argue that the district court erroneously relied upon evidence offered by defendants to rebut plaintiffs' separation-of-powers claims.  In dismissing plaintiffs' state law claims, however, the district court did not refer to any evidence offered by defendants.  Rather, it found that each cause of action was an allegation solely under state law that may not be brought pursuant to 42 U.S.C. § 1983.  Therefore, plaintiffs' argument is without merit, and the district court's dismissal of these claims is affirmed.

III.

Plaintiffs also challenge the district court's dismissal of their bad faith claim.  On December 18, 2002, the Ohio Supreme Court decided *Layne v. Ohio Adult Parole Authority*, 780 N.E.2d 548 (Ohio 2002).  Prior to *Layne*, the OAPA calculated a prisoner's parole guideline range by considering all of the circumstances surrounding the prisoner's offense(s), including, for example, convictions for which the prisoner had been acquitted or charges that had been dropped pursuant to a plea agreement.  *Id.* at 550.  The *Layne* court concluded that "the [O]APA must assign an inmate the offense category score that corresponds to the offense or offenses of conviction."  *Id.* at 555.  The *Layne* court explained further, however, that once the OAPA correctly calculates the prisoner's parole guideline range, the OAPA "still retains its discretion to consider any circumstances relating to the offense or offenses of conviction, including crimes that did not result in conviction, as well as any other factors the [O]APA deems relevant."  *Id.*

Defendants in this case have argued that a number of plaintiffs' claims were resolved by *Layne* and were therefore rendered moot.  Defendants submitted an affidavit from Richard Spence, Chief of Quality Assurance for the Ohio Parole Board, stating that the OAPA began calculating offense category scores pursuant to the instructions of *Layne* on the date that *Layne* was decided, December 18, 2002.  Defendants moved for dismissal of those aspects of plaintiffs' claims that relied on the OAPA's calculation of the parole guideline range, and on March 24, 2003, the district court dismissed those claims.  Plaintiffs have not appealed that decision.

On April 1, 2003, plaintiffs filed an amended complaint.  Most of plaintiffs' amended complaint repeated claims raised in their original complaint, but plaintiffs added claims to one cause of action:  "Bad Faith."  Plaintiffs alleged that Spence's affidavit was false and described a number of individual plaintiffs who were not released on parole, despite having served more time in prison than was dictated by a correctly calculated parole guideline range.  It appears that their revised bad-faith cause of action may have been plaintiffs' attempt to revive, in part, their previously dismissed state-law claims – in effect, plaintiffs alleged that their previously dismissed claims should not have been dismissed because the district court relied on a false affidavit in declaring those claims moot.

Nevertheless, plaintiffs' bad-faith claims do not affect the resolution of this case.  First, plaintiffs should have moved for reconsideration, rather than alleging an additional claim, if they wanted the district court to revisit its earlier ruling.  Second, plaintiffs have not attempted to explain how the filing of the allegedly false affidavit violated the Constitution or federal law.  Third, and most importantly, plaintiffs' allegations do not even suggest that Spence's affidavit was actually false.  The affidavit states that, after *Layne*, the OAPA took into account only a prisoner's actual convictions in *calculating* the prisoner's parole guideline range.  The *Layne* court, however, concluded that the OAPA could *consider* any other factors in making its ultimate decision.  *Id.* at 555. Spence's affidavit did not mention whether the OAPA considered other factors. Plaintiffs did not allege that the OAPA erroneously *calculated* any prisoner's guideline range, but instead alleged that a number of individual prisoners were not released on parole, despite serving more time in

prison than their parole guideline range dictated.  That practice is not inconsistent with *Layne* or Spence's affidavit; pursuant to *Layne*, the OAPA could have considered other factors and concluded that the prisoner's guideline range did not adequately serve the interests of society.  Therefore, even if we were to assume that plaintiffs' bad-faith claims were raised properly, we would conclude that plaintiffs have failed to state a claim upon which relief can be granted.

IV.

Next, plaintiffs challenge the district court's holding that their due process claims fail because they do not have a liberty interest in parole under state law.  Plaintiffs contend that the district court erred in concluding that their claims are barred by *Jago v. Van Curen*, 454 U.S. 14, 20 (1981), and that their due process claims should be analyzed under the standard announced by the Court in *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  We affirm the district court's entry of summary judgment in favor of defendants on plaintiffs' due process claims.

In *Swihart v. Wilkinson*, 209 F. App'x 456 (6th Cir. 2006), we considered and rejected the same argument that plaintiffs raise here – that the denial of parole should be analyzed under *Sandin*'s "atypical and significant hardship" standard.  We held, in pertinent part, as follows:

> The district court properly concluded that Swihart's complaint failed to state a claim upon which relief could be granted.  Although Swihart's due process challenge to the procedures used by the parole board is cognizable under § 1983 pursuant to *Wilkinson v. Dotson*, 544 U.S. 74 (2005), Swihart failed to state a violation of due process.  A plaintiff bringing a § 1983 action for procedural due process must show that the state deprived him or her of a constitutionally protected interest in "life, liberty, or property" without due process of law.  *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (citing *Parratt v. Taylor*, 451 U.S. 527, 537 (1981)).  A Fourteenth Amendment procedural due process claim depends upon the existence of a constitutionally cognizable liberty or property interest with which the state has interfered.  *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  However, this Court has repeatedly noted that "there is no constitutional or inherent right of a convicted person to be conditionally released [e.g., paroled] before the expiration of a valid sentence."  *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979).  The Constitution of the United States does not require a state to provide a parole system.  *See Pennsylvania v. Finley*, 481 U.S. 551, (1987).  More importantly, the state of Ohio has not created a liberty interest in parole eligibility, as it has a completely discretionary parole system.  *See Saunders v. Williams*, 89 F. App'x 923, 924 (6th Cir. 2003); OHIO REV. CODE § 2967.03; *Jago v. Van Curen*, 454 U.S. 14, 20-21 (1981); *Inmates of Orient Corr. Inst. v. Ohio State Adult Parole Auth.*, 929 F.2d 233, 235-37 (6th Cir. 1991).
>
> Swihart argues that the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472, 484 (1995), requires his claim be analyzed under a different standard and that the "nature of the deprivation" must be considered.  However, Swihart's due process claim also fails if analyzed under *Sandin*.  In *Sandin*, the Supreme Court mandated that a state creates a liberty interest in avoiding certain prison conditions only where those conditions are an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Id.*  However, *Sandin* was decided only in the context of prison conditions, not parole eligibility.  This Court has never held that an inmate's eligibility for parole at a certain time, under a discretionary parole system, is an "atypical and significant hardship."  Swihart's eligibility or non-eligibility for parole does not affect the manner in which he is confined and, thus, no liberty interest is implicated.

*Swihart*, 209 F. App'x at 458-59.  Although *Swihart* is an unpublished decision and, therefore, not precedentially binding under the doctrine of stare decisis, *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 376 n.4 (6th Cir. 2007), we find this portion of its analysis persuasive and consistent with our due process jurisprudence.**3**  Since *Swihart*, we have not extended *Sandin* to the parole eligibility context, and plaintiffs have not articulated why *Sandin*'s "atypical and significant hardship" standard should be so expanded.  We therefore affirm the district court's entry of summary judgment on plaintiffs' due process claims in favor of  defendants.

V.

Plaintiffs next challenge the district court's entry of summary judgment in favor of defendants on their equal protection claims.  Plaintiffs contend that the State violates the Equal Protection Clause by giving new inmates fixed sentences, while inmates sentenced prior to 1995 serve indeterminate terms.  In addition, plaintiffs argue that the State violated the Equal Protection Clause by adopting the 1998 guidelines.  The district court granted defendants' motion for summary judgment, holding that the State's decision not to apply the 1996 sentencing law retroactively and to adopt the 1998 guidelines withstands a rational basis constitutional review.  We agree with the district court and affirm.

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  As we have explained, "to withstand Fourteenth Amendment scrutiny, statutes that do not interfere with fundamental rights or single out suspect classifications must bear only a rational relationship to a legitimate state interest."  *Jackson v. Jamrog*, 411 F.3d 615, 618 (6th Cir. 2005) (quoting *Richland Bookmart, Inc. v. Nichols*, 278 F.3d 570, 574 (6th Cir. 2002)).  The district court concluded properly that plaintiffs are not members of a suspect class and that they do not allege a violation of a fundamental right.  "Without question, prisoners are not considered a suspect class for purposes of equal protection litigation."  *Jackson*, 411 F.3d at 619; s*ee also Wilson v. Yaklich*, 148 F.3d 596, 604 (6th Cir. 1998).  In addition, there is no fundamental right to parole under the Constitution.  *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1982); *Jackson*, 411 F.3d at 619.

Because neither a fundamental right nor a suspect class is at issue, the rational basis review standard applies.  *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006).  "Under rational basis scrutiny, government action amounts to a constitutional violation only if it 'is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational.'" *Id.* (quoting *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005)).  The plaintiffs bear the burden of demonstrating that the government lacks a rational basis, and they may satisfy this burden either by negating "'every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will.'" *Id.* (quoting *Warren*, 411 F.3d at 711).  The State, conversely, bears no burden of proof; its legislative choice is presumptively valid and "'may be based on rational speculation unsupported by evidence or empirical data.'" *Id.* (quoting *Trihealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005)).

We hold that plaintiffs have not negated defendants' asserted rational bases for refusing to apply the 1996 sentencing law retroactively and for adopting the 1998 guidelines.  Among its stated rationales for limiting the 1996 sentencing law to prospective application only, the State argues that the Ohio legislature sought to address the issue of sentencing reform "one step at a time."  In general, this is a rational basis.  *See Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489

---

**3**As discussed in Section V, *infra*, we reject, as inconsistent with Supreme Court precedent, the additional holding of *Swihart* that "the Ohio parole guidelines which postpone parole are guidelines only, not laws, and are, therefore, not subject to the Ex Post Facto Clause."  *Swihart*, 209 F. App'x at 459.

(1955) ("The problem of legislative classification is a perennial one, admitting of no doctrinaire definition.  Evils in the same field may be of different dimensions and proportions, requiring different remedies.  Or so the legislature may think.  Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.  The legislature may select one phase of one field and apply a remedy there, neglecting the others.") (internal citations omitted).  Defendants have also explained the prospective application of the new sentencing law by stating that it keeps "with the well recognized rule of statutory construction that provides 'statutes affecting substantive rights and liabilities are presumed to have only prospective effect.'" *Crosby-Bey v. District of Columbia*, 700 F. Supp. 71, 73 (D.D.C. 1988) (quoting *Anderson v. USAir, Inc.*, 818 F.2d 49, 53 (D.C. Cir. 1987) and *Bennett v. New Jersey*, 470 U.S. 632, 639 (1985)).  These rationales are sufficient to satisfy our rational basis review in light of binding precedent, *see Meeks v. Jago*, 548 F.2d 134, 138 (6th Cir. 1976), *abrogated on other grounds by Rose v. Lundy*, 455 U.S. 509, 522 (1982), and plaintiffs have not offered any argument or evidence in response.

In explaining their adoption of the 1998 guidelines, defendants stated in the district court that the previous guidelines "did not allow for sufficiently accurate evaluation of inmates' cases, and [they] produced inconsistent results and very low release rates."  Further, defendants argued that the intent behind the new guidelines was to "promote a more consistent exercise of discretion, and enable fairer and more equitable decision-making without removing the opportunity for consideration of parole eligibility on an individual case basis."  As the district court found, the 1998 guidelines "implement that rational objective by providing a means to channel the factors parole officials focus on when making release decisions."  On appeal, plaintiffs have not offered any argument or evidence to rebut that rationale.  Thus, we affirm the district court's entry of summary judgment on plaintiffs' equal protection claims.

VI.

Finally, plaintiffs argue that the district court erred in holding that the Ex Post Facto Clause does not apply to Ohio's parole guidelines.  The district court granted defendants' motion for summary judgment on plaintiffs' Ex Post Facto Clause claims, holding that "[i]nternal parole guidelines 'are not laws for ex post facto purposes because the guidelines do not absolutely restrict parole officials' discretion.'"  In the alternative, the court held that, even assuming the guidelines are laws for ex post facto purposes, retroactive application of the guidelines does not create a sufficient risk of increasing the measure of punishment attached to the underlying crime.  We agree with the district court's alternate holding and affirm on that basis.

The Constitution prohibits states from imposing ex post facto laws.  U.S. CONST. art. I, § 10, cl. 1.  "An ex post facto law possesses two elements:  (1) 'it must apply to events occurring before its enactment,' and (2) 'it must disadvantage the offender affected by it.'"  *Dyer v. Bowlen*, 465 F.3d 280, 285 (6th Cir. 2006) (quoting *Lynce v. Mathis*, 519 U.S. 433, 441 (1997)).  In granting defendants summary judgment on plaintiffs' ex post facto claims, the district court relied on *Ruip v. United States*, 555 F.2d 1331, 1335-36 (6th Cir. 1977), to hold that the 1998 guidelines are not "laws" for ex post facto purposes.  In *Ruip*, the appellant was sentenced in 1971 to a term of eighteen years imprisonment for his participation in an armed bank robbery.  *Id.* at 1332.  In 1973, the United States Parole Commission established a national parole policy and adopted parole guidelines.  *Id.* at 1333.  After the appellant was denied parole in 1975, he raised an ex post facto challenge to the denial of his parole request, which was based on the application of the newly-promulgated guidelines.  *Id.* at 1333-34.  We denied the appellant's claim, holding that administrative guidelines on parole do not come within the prohibition against ex post facto laws.  *Id.* at 1335-36.  We reasoned that:

what is involved in this case is not agency interpretation of law but an agency's setting up guidelines for itself to assure the uniform execution of its business. These guidelines are not law, but guideposts which assist the Parole Commission (and which assisted the Board of Parole) in exercising its discretion. Nor do these guidelines have the characteristics of law. They are not fixed and rigid, but are flexible. The Commission remains free to make parole decisions outside of these guidelines.

*Id.* at 1335.

Although not previously addressed by this court in a published opinion, we now conclude that *Ruip* should no longer be followed because it is inconsistent with the Supreme Court's decision in *Garner v. Jones*, 529 U.S. 244 (2000).[4] In *Garner*, the Court considered an ex post facto challenge to the retroactive application of a Georgia regulation permitting the extension of intervals between parole violations. *Id.* at 247. Under Georgia law, the state's parole board was required to consider inmates serving life sentences for parole after seven years. *Id.* (citing GA. CODE ANN. § 42-9-45(b) (1982)). At the time the *Garner* respondent committed his second offense, the parole board's regulations required parole reconsiderations to take place every three years. *Id.* In 1985, after the respondent had begun serving his second life sentence, the parole board amended its rules and regulations to provide that "reconsideration of those inmates serving life sentences who have been denied parole shall take place at least every eight years." *Id.* (quoting GA. COMP. R. & REGS., Rule 475-3-.05(2) (1985)). The Parole Board considered the respondent for parole in 1989, seven years after his 1982 conviction. *Id.* After denying release, reconsideration was set for 1997, eight years later and consistent with Rule 475-3-.05(2). *Id.*

The Court concluded that, on its face, the new parole board regulation did not pose a significant risk of lengthening the respondent's time of imprisonment.[5] *Id.* at 256. The Court noted two important aspects of the new regulation. First, the amendment "vests the Parole Board with discretion as to how often to set an inmate's date for reconsideration, with eight years for the maximum." *Id.* at 254 (quoting GA. COMP. R. & REGS., Rule 475-3-.05(2) (1985)) ("Reconsideration . . . shall take place at least every eight years."). Second, the parole board's policies permit "expedited parole reviews in the event of a change in their circumstances or where the Board receives new information that would warrant a sooner review." *Id.* These characteristics were significant because they "permit a more careful and accurate exercise of the discretion the Board has had from the outset." *Id.* "The policy enables the Board to put its resources to better use, to ensure that those prisoners who should receive parole come to its attention." *Id.*

There are several aspects of the Supreme Court's decision in *Garner* that contradict our ex post facto jurisprudence and affect Ohio's parole guidelines at issue here. First, the Court made clear that guidelines that affect discretion, rather than mandate outcomes, are nevertheless subject to ex post facto scrutiny: "The presence of discretion does not displace the protections of the Ex Post Facto Clause, however." *Id.* at 253; *Dyer*, 465 F.3d at 288 (noting that *Garner* provides "that discretion in parole considerations does not insulate the state from ex post facto violations."). *Cf. Kilbane v. Kinkela*, 24 F. App'x 241, 242-43 (6th Cir. 2001) ("In the past, this court has found that Ohio parole officials have complete discretion in deciding whether an Ohio inmate will be paroled

---

[4] *See generally United States v. Checchini*, 967 F.2d 348, 350 (9th Cir. 1992) (applying the rule that circuit court opinions should not be followed when they are inconsistent with an intervening Supreme Court decision).

[5] Because the "Court of Appeals' analysis failed to reveal whether the amendment to Rule 475-3-.05(2), in its operation, created a significant risk of increased punishment for respondent," and because the respondent claimed that he had not been permitted sufficient discovery to make this showing, the Supreme Court remanded the case for further discovery. *Id.* at 257.

. . . and the plaintiffs point to no change in the law negatively restricting this discretion.") (citing *Inmates of Orient Corr. Inst. v. Ohio St. Adult Parole Auth.*, 929 F.2d 233, 236 (6th Cir. 1991)); *Adams v. Upper*, No. 94-4235, 67 F.3d 299, 1995 WL 570915, at \*2 (6th Cir. Sept. 27, 1995) (unpublished table decision) ("Parole guidelines that do not divest a parole board's discretion in granting parole do not qualify as ex post facto laws.").

Second, as Justice Scalia noted in his concurring opinion in *Garner*, the parole guidelines at issue in *Garner* were administrative regulations issued by the Georgia State Board of Pardons and Paroles, rather than a change to the parole laws made by the Georgia legislature. *See Garner*, 529 U.S. at 249 (Scalia, J., concurring) ("I would agree with the Court's opinion if we were faced with an amendment to the frequency of parole-eligibility determinations prescribed by the Georgia legislature."). The application of ex post facto scrutiny to an administrative regulation in *Garner* contradicts our holdings in several unpublished decisions decided after *Garner*.[6]

Finally, the respondent in *Garner* was serving his second life sentence, after previously escaping from prison and committing murder while on escape. *Garner*, 529 U.S. at 247. Although it was impossible for the respondent to serve a longer term of imprisonment than his maximum imposed sentence (life), the Supreme Court nevertheless remanded the case to the district court so that the respondent could engage in discovery in order to attempt to establish that the challenged parole created a significant risk of increased punishment for the respondent. *Id.* at 248-49. *Cf. Hunt v. Wilkinson*, 79 F. App'x 861, 862 (6th Cir. 2003) (unpublished) ("Hunt was sentenced, as noted above, to life in prison, consecutive to other terms of imprisonment, with the possibility of a discretionary grant of parole. The new regulations, which may increase the periods between parole hearings, and do not give Hunt a projected release date, do nothing to increase the punishment to which Hunt was originally sentenced.").

After *Garner*, the relevant inquiry, therefore, is not whether the challenged parole regulation is a "law" or whether the guidelines present a significant risk of increasing the plaintiff's maximum penalty, but rather whether the new guidelines present a significant risk of increasing the plaintiff's amount of time actually served. *See Garner*, 529 U.S. at 255 ("When the rule does not by its own terms show a significant risk, the respondent must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the current rule."); *id.* ("In the case before us, respondent must show that as applied to his own sentence the law created a significant risk of increasing his punishment."). *See also Fletcher v. Reilly*, 433 F.3d 867, 869-70 (D.C. Cir. 2006) (observing that it is clear after *Garner* that "the critical question in ex post facto challenges to retroactively applied parole/reparole regulations is whether, as a practical matter, the retroactive application creates a significant risk of prolonging an inmate's incarceration"). *But see United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006) (holding that post-*Booker* Sentencing Guidelines are not subject to ex post facto analysis, as "the ex post facto clause should apply only to laws and regulations that bind rather than advise, a principle well established with reference to parole guide-lines whose retroactive application is challenged under the ex post facto clause").

---

[6] *See, e.g., Swihart*, 209 F. App'x at 459 (observing that this court has held previously that "the Ohio parole guidelines which postpone parole are guidelines only, not laws, and are, therefore, not subject to the Ex Post Facto Clause"); *Conley*, 23 F. App'x at 506 (same); *see also Kilbane*, 24 F. App'x at 242-43 (denying ex post facto challenge to 1998 guidelines and observing that "this court has found that Ohio parole officials have complete discretion in deciding whether an Ohio inmate will be paroled and the plaintiffs point to no change in the law negatively restricting this discretion") (internal citation omitted). These unpublished opinions are not precedentially binding under the doctrine of stare decisis, *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007), and no published Sixth Circuit case since *Garner* has held that the Ohio parole guidelines are not "laws" within the meaning of the Ex Post Facto Clause.

We find the D.C. Circuit's experience in the wake of *Garner* particularly instructive. In *Fletcher v. District of Columbia*, 370 F.3d 1223, 1228 (D.C. Cir. 2004) ("*Fletcher I*"), the court rejected a habeas petitioner's ex post facto challenge to the application of the United States Parole Commission guidelines to his parole hearing, holding that a parole guideline is not a "law" within the proscription of the Ex Post Facto Clause. Upon the inmate's petition for rehearing, the Court of Appeals for the D.C. Circuit vacated *Fletcher I*, acknowledging *Garner*'s instruction that the "controlling inquiry" is "'whether retroactive application of the change' in a regulation respecting parole creates 'a sufficient risk of increasing the measure of punishment attached to the covered crimes.'" *Fletcher v. District of Columbia*, 391 F.3d 250, 251 (D.C. Cir. 2004) ("*Fletcher II*") (quoting *Garner*, 529 U.S. at 250). The D.C. Circuit in *Fletcher II* observed that, in *Garner*, the Court "foreclosed our categorical distinction between a measure with the force of law and 'guidelines [that] are merely policy statements from which the Commission may depart in its discretion.' Rather, the question is one of practical effect." *Fletcher II*, 391 F.3d at 251 (internal citation omitted).

In a later appeal, the D.C. Circuit Court reiterated its continued allegiance to *Garner*'s focus on the practical effect to the plaintiff: "The labels 'regulation' and 'guideline' are not determinative. And the existence of discretion is not dispositive. The controlling inquiry under *Garner* is how the Board or the Commission exercises discretion in practice, and whether differences between the exercise of discretion in two systems actually 'create[] a significant risk of prolonging [an inmate's] incarceration.'" *Fletcher v. Reilly*, 433 F.3d 867, 876-77 (D.C. Cir. 2006) ("*Fletcher III*") (quoting *Garner*, 529 U.S. at 251). The 1998 Ohio guidelines are similar to the guidelines at issue in *Fletcher* as they both guide the discretion of the parole board in making parole determinations, and we find the approach taken by the D.C. Circuit to be consistent with *Garner*.

The relevant inquiry in this case, then, is whether retroactive application of the 1998 Ohio guidelines creates a "sufficient risk of increasing the measure of punishment attached to the covered crimes." *Garner*, 529 U.S. at 250; *Dyer*, 465 F.3d at 285. Plaintiffs can satisfy this burden in one of two ways. First, plaintiffs can establish an ex post facto violation if they can show that the guidelines, on their face, show a significant risk of increased incarceration. *Garner*, 529 U.S. at 255. Second, when the guidelines do not by their own terms show a significant risk, plaintiffs "must demonstrate, by evidence drawn from the [guideline's] practical implementation by the agency charged with exercising discretion, that its application will result in a longer period of incarceration than under the earlier [guidelines]." *Id.; see also Dyer*, 465 F.3d at 291 (observing that "even when considering substantive changes to parole provisions, the Supreme Court has relied on evidence of actual disadvantage" to the plaintiff). Plaintiffs need not show an actual increase in punishment, but rather a "sufficient risk" of increased punishment. *Dyer*, 465 F.3d at 288.

We hold that on this record, plaintiffs have not shown that a genuine issue of material fact exists regarding whether the retroactive application of the 1998 guidelines, either on their terms or as applied to plaintiffs, creates a "sufficient risk of increasing the measure of punishment attached to the covered crimes." *Garner*, 529 U.S. at 250. First, although plaintiffs cite *Garner* in their brief, they make no argument in the section of their brief devoted to their ex post facto claim that the guidelines create a sufficient risk of increasing the length of imprisonment for plaintiffs.

Moreover, the disparity among members in the plaintiff class precludes a uniform analysis of their ex post facto claims. Prior to 1987, no guidelines were issued to guide the parole board's discretion in making sentencing determinations. In 1987, the parole board adopted guidelines to assist it in exercising its discretion. *See State v. Capots*, 546 N.E.2d 412 (Ohio 1989). Eleven years later, in 1998, the OAPA adopted the guidelines at issue here, replacing the 1987 guidelines. The purported class of plaintiffs, however, includes members who were convicted before the 1987 guidelines were adopted, as well as members who were convicted after the 1987 guidelines were enacted. For plaintiffs who were convicted before the 1987 guidelines were in effect, the relevant

ex post facto inquiry is whether the present guidelines create a sufficient risk of increased punishment compared to the pre-1987 standards; for plaintiffs convicted after 1987, the comparison is between the 1987 guidelines and the 1998 guidelines. Although the parties have included the 1998 guidelines in the joint appendix, the 1987 guidelines are not included.

Similarly, because plaintiffs' motion for class certification has not been granted, they must demonstrate that a genuine issue of material fact exists as to whether each individual plaintiff faces a significant risk of increased incarceration due to the application of the 1998 guidelines. Yet, on appeal, plaintiffs have not attempted to show how any one individual defendant faces a substantial risk of serving more time under the new guidelines.

Finally, plaintiffs point to three pages of charts and graphs in the record, which compare the amount of time served under the 1998 guidelines to the minimum sentence assigned by the trial court.[7] These statistics fail to support plaintiffs' claim in two ways. First, the sample group of inmates apparently does not distinguish between inmates sentenced before and after the 1987 guidelines. Second, the statistics purport to show only that inmates sentenced under the 1998 guidelines are likely to wait until after their minimum sentences have expired before receiving their initial parole hearing, are likely to receive sentences and projected sentences that exceed the minimum sentence, and are likely to receive sentences and projected sentences that exceed even the sentences recommended by the guidelines. Plaintiffs assert that they would have received their initial parole hearings earlier and would have ultimately received shorter sentences under pre-1998 practices, but have not pointed to any evidence in the record whatsoever regarding pre-1998 practices. Without any evidence of how current parole practices differ from pre-1998 practices, plaintiffs cannot establish a violation of the Ex Post Facto Clause.

Moreover, even if plaintiffs' statistical study purported to show that inmates served longer sentences under the 1998 guidelines than they would have before 1998, such results would be unsurprising in light of *Layne*. In *Layne*, the plaintiffs were Ohio inmates whose convictions were based on plea agreements in which the inmate pleaded guilty to lesser-included charges in exchange for the state's dismissal of the most serious charge on the indictment. When the plaintiffs first became eligible for parole after the adoption of the 1998 guidelines, the inmates were assigned criminal history points based on the crimes for which they were originally indicted, rather than the crimes for which they were ultimately convicted. *Id.* at 551. This resulted in the plaintiffs receiving an applicable guidelines range that provided for parole eligibility later than the inmate's minimum sentence. *Id.* at 555. The Ohio Supreme Court held that this practice breached the inmate's plea agreements and rendered meaningless former OHIO REV. CODE § 2967.13, which provided that an inmate "becomes eligible for parole at the expiration of his minimum term." *Id.* The court held further that "in any parole determination involving indeterminate sentencing, the APA must assign an inmate the offense category score that corresponds to the offense or offenses of conviction." *Id.* Plaintiffs here do not specify whether the sample size of their study post-dates *Layne* and, thus, whether the guidelines as now practiced have the effect of delaying initial parole hearings. Furthermore, plaintiffs' study does not purport to show whether inmates actually serve more time under the 1998 guidelines than under the former system.

Given these deficiencies in plaintiffs' proofs, we conclude that plaintiffs have not raised a genuine issue of material fact regarding whether the retroactive application of the 1998 guidelines creates a substantial risk of increased punishment for any member of the class. We therefore affirm

---

[7]The study was apparently performed by plaintiffs' attorney Sirak, who pulled 600 cases and encoded each inmate's offenses under one of seven categories: (1) sex crimes, (2) homicide, (3) drugs, (4) property crimes, (5) assault, (6) kidnapping, and (7) child endangerment. Dr. Martin Schwartz was retained by plaintiffs and opined that the 600 sample size of Sirak's study is statistically similar to the rest of the sample of cases, and that "any statistics run on this set of 600 cases can be taken as representative of the full group of cases."

the district court's alternate holding and its entry of summary judgment to defendants on plaintiffs' ex post facto claims.

## VII.

One last issue merits our attention. Plaintiffs assert that "[a]n entire class action lawsuit seeking habeas corpus relief has fallen through the cracks, drawing no comment at all." From this and other comments made at oral argument, it appears that plaintiffs believe that, in addition to their § 1983 action, they have filed a petition for a writ of habeas corpus based on issues related to *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005). The source of this belief appears to be plaintiffs' "Supplemental Pleading Pursuant to Rule 15(d)," filed in the district court on May 24, 2005. In appropriate circumstances, a party may, with permission of the court, "serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." FED. R. CIV. P. 15(d). Plaintiffs attempted to take advantage of Rule 15 by filing a supplemental pleading that referenced *Blakely* and *Booker*. Plaintiffs appear to believe that they stated additional claims in their supplemental pleading – claims unaddressed by the district court.

Plaintiffs' belief is mistaken. First, plaintiffs did not set forth any new "transactions or occurrences or events" in their supplemental pleading, but instead attempted to allege additional claims for relief based on the same events underlying their original pleading. A Rule 15(a) motion for leave to amend the complaint, not a Rule 15(d) motion to supplement the pleading, is the appropriate mechanism through which a party may assert additional claims for relief. *See United States v. Hicks*, 283 F.3d 380, 385-86 (D.C. Cir. 2002) ("The question in this case is whether intervening judicial decisions are the sort of 'occurrences or events' to which Rule 15(d) refers. We think not. The purposes to which the rule is typically put support the conclusion that the appropriate bases for supplemental pleadings are new facts bearing on the relationship between the parties, rather than merely changes in law governing those facts."). Second, a review of the "Supplemental Pleading Pursuant to Rule 15(d)" indicates that it did not state any new claims, but instead merely discusses habeas corpus relief and describes the circumstances of a number of named plaintiffs. Because plaintiffs abused Rule 15(d) and did not state any new claims in their supplemental pleading, plaintiffs never properly filed their purported "class action seeking habeas corpus relief." Accordingly, we conclude that the district court did not err in declining to address plaintiffs' purported habeas claims.

## VIII.

For the reasons set forth above, we affirm the judgment of the district court.