# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 21, 2013

No. 11-30919

Lyle W. Cayce
Clerk

ROBERT HOWARD,

Plaintiff - Appellant

v.

LARRY CLARK, Chairman of the Louisiana Board of Pardons; EUGENE
"POP" HATAWAY, Member of the Louisiana Board of Pardons; CLEMENT
LAFLEUR, Member of the Louisiana Board of Pardons; KENNETH A.
JONES, Member of the Louisiana Board of Pardons; HENRY W. POWELL,
Member of the Louisiana Board of Pardons; BOBBY JINDAL, Governor of the
State of Louisiana,

Defendants - Appellees

Appeal from the United States District Court
for the Middle District of Louisiana

Before JOLLY, GARZA, and OWEN, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Robert Howard ("Howard") is currently serving life sentences in Louisiana.
He has repeatedly sought to have his sentences commuted in order to become
eligible for parole, commutation being the first step in becoming eligible for
consideration for parole. After he was first convicted, Louisiana altered its
commutation process. This appeal addresses Howard's complaint that the
application of the new process to him violates the *ex post facto* provisions of the
United States and Louisiana Constitutions in two ways: (1) by vesting the Board

No. 11-30919

with new authority, in certain circumstances, to refuse to grant a hearing to an applicant for commutation; and (2) by increasing the time he must wait between filing applications for commutation from one or two years following the last action by the Board to five years. Each of these factors, Howard argues, increases his risk of punishment by rendering the commutation process more burdensome. The district court granted summary judgment to the defendants, finding Howard could not establish an *ex post facto* violation. We AFFIRM.

## I.

Howard has been in prison a long time. More than forty years have come and gone since Howard pled guilty to murder and received a sentence of life imprisonment in 1968. Howard did not help himself when, three years later, he stabbed another inmate at the penitentiary, was convicted of murder, and received a second life sentence. These life sentences, however, were imposed without restriction as to parole eligibility pursuant to former LSA-C. Cr. P. art. 817. Since that time, Howard has earned his General Equivalency diploma, taken numerous classes and completed theological course work through the New Orleans Baptist Seminary, participated in numerous prison clubs, and become a mentor to IMPACT program participants.

Howard has been holding onto hope. Under Louisiana law, life-sentenced prisoners are ineligible for parole consideration until their sentence has been commuted to a fixed term of years. LA. REV. STAT. § 15:574.4(B)(1). Because he has constantly been seeking parole, Howard has applied for a commutation several times, as a precursor to parole eligibility. In 1979, the Board recommended commutation, but the Governor returned it unsigned in 1988 when he left office. Howard reapplied for commutation that same year, but the Board denied his application. In 1990, Howard applied and received a favorable recommendation, but the Governor rejected it. The Board then denied Howard's 1996 application. But Howard reapplied in 2002, the Board held a hearing in

2

No. 11-30919

2003, and it again favorably recommended Howard; the Governor, however, took no action on his application before leaving office in 2004. Finally, the Board automatically reconsidered and rejected Howard's application in 2005. The instant appeal derives from this final disappointment.

Howard contends that his 2005 denial resulted from changes to Louisiana law. Under the Louisiana Constitution of 1921, the Governor had authority to grant pardons or commutations of sentences upon the recommendation of the Lieutenant Governor, the Attorney General, and the judge who presided over the conviction, or any of those two. *See Gaillard v. Cronvich*, 269 So. 2d 231, 232 (La. 1972). At the time of Howard's 1968 conviction, LA. REV. STAT. § 15:571.7 (repealed) was in effect:

> Whenever a prisoner who has been convicted of a crime and sentenced to imprisonment for life, so conducts himself as to merit the approval of the superintendent of the state penitentiary he may apply for a commutation of his sentence and the application, upon approval of the superintendent, shall be forwarded to the governor. The governor may commute the sentence upon the recommendation in writing of the lieutenant governor, attorney general, and presiding judge of the court before which the conviction was had or any two of them. No commutation under this Section shall reduce the period of incarceration to less than ten years and six months.

*State v. Ramsey*, 292 So. 2d 708, 710 n.1 (La. 1974). According to the summary judgment evidence that Howard presented, the rules of the Board of Pardons in effect at the time of his convictions allowed a prisoner to reapply for a pardon or commutation after one year elapsed from the date of the Board's last action on his file.[1]

These procedures changed when Louisiana "entirely revamped" its pardon process in connection with the passage of its 1974 Constitution. *See Touchet v. Broussard*, 31 So. 3d 986, 994 n.9 (La. 2010). The new Constitution provided for

---

[1] This rule was allegedly promulgated pursuant to statutory authority.

3

No. 11-30919

"the creation of a Pardon Board [and] provided that the new governor could only grant pardons upon the recommendation of this newly created pardon board." *Id.*; § 15:572(A). The Board is now comprised of five members selected by the Governor. LA. REV. STAT. § 15:572.1(A).

Among the other changes, LA. REV. STAT. § 15:572.4(D) now restricts the ability of life-sentenced prisoners to apply for relief from the Pardon Board. In relevant part, this provision imposes a five-year waiting period for "any subsequent applications."[2] § 15:572.4(D). The provisions of § 15:572.4(D) "shall not apply when the board determines that new and material evidence that . . . was not discovered before or during trial, is available, and if it had been introduced at trial, it would probably have changed the verdict or judgment of guilty." *Id.*

Not only has the law changed, but the Pardon Board has also altered its rules since Howard was convicted. Relevant to this appeal, Rule 3 was amended to allow the Board to deny an applicant a hearing due to "serious nature of the offense; insufficient time served on sentence; insufficient time after release; proximity of parole/good time date; institutional disciplinary reports; probation/parole-unsatisfactory/violated; past criminal record; or any other factor determined by the Board." Howard contends the Pardon Board implicitly applied § 15:572.4(D) and its Rule 3 to him when it refused to grant him a hearing in May 2005, and informed him that he could reapply in five years. Howard filed this suit, seeking declaratory relief that these laws violate the *Ex Post Facto* Clause; injunctive relief barring the defendants from applying these laws to him; and an order requiring the laws in effect at the time of his offenses be applied to any future reviews of his commutation application.

---

[2] The statute establishes a seven-year waiting period for an applicant's second application, and a five-year waiting period for every application thereafter. § 15:572.4(D).

No. 11-30919

## II.

These changes, Howard argues, impose new and unconstitutional burdens on his efforts to gain freedom. Simply put, *ex post facto* laws prohibit states from enacting laws that, "by retroactive application, increase the punishment for a crime after its commission." *Garner v. Jones*, 529 U.S. 244, 249 (2000). The particular question this case raises is whether Rule 3 and the five-year waiting period Louisiana enacted after Howard's incarceration sufficiently increased his risk of punishment so as to create an *ex post facto* violation.

Although the Supreme Court has previously held that changes to laws governing parole may, in some cases, constitute *ex post facto* violations, neither it nor this court has ever decided whether changes to the commutation laws and procedures may violate this precept. *See Garner*, 529 U.S. at 250 (citing *Lynce v. Mathis*, 519 U.S. 433 (1997) (citing *Weaver v. Graham*, 450 U.S. 24, 32 (1981)); *Cal. Dep't of Corrections v. Morales*, 514 U.S. 499, 508-09 (1981)). Assuming *arguendo* that a change to the commutation process can violate the *ex post facto* laws in the same way changes to parole procedures can,[3] it is clear the changes

---

[3] *Lewis-El v. Sampson*, 649 F.3d 423, 426 (6th Cir. 2011) (noting this is "a generous assumption"). It may be possible to conceive of a change to the commutation process that "creates a significant risk of prolonging a respondent's incarceration," *Garner*, 529 U.S. at 251, if, for example, that change abolished the possibility of commutation altogether. The Supreme Court has, however, held that "[a]s a matter of law, parole and commutation are different concepts." *Solem v. Helm*, 463 U.S. 277, 300 (1983). For example, Chief Justice Burger noted that, "[r]ather than being an *ad hoc* exercise of clemency, parole is an established variation on imprisonment of convicted criminals," *id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972)), and that "there is a vast difference between a denial of parole . . . and a state's refusal to commute a lawful sentence." *Id.* (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 466 (1981). Similarly, in *Solem v. Helm* the Court held

> The possibility of commutation is nothing more than a hope for "an *ad hoc* exercise of clemency." It is little different from the possibility of executive clemency that exists in every case in which a defendant challenges his sentence under the Eighth Amendment. Recognition of such a bare possibility would make judicial review under the Eighth Amendment meaningless.

463 U.S. at 303. Thus, the *Ex Post Facto* Clause, if it applies at all, would likely not function

at issue here do not do so. *See, e.g.*, *Morales*, 514 U.S. at 509 ("The amendment create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes, and such conjectural effects are insufficient under any threshold we might establish under the *Ex Post Facto* Clause."); *Garner*, 529 U.S. at 252 (finding no *ex post facto* violation and noting "the *Ex Post Facto* Clause should not be employed for 'the micromanagement of an endless array of legislative adjustments to parole and sentencing proceedings'" (quoting *Morales*, 514 U.S. at 508)). The Governor's ultimate decision as to whether to grant commutation is entirely discretionary, despite the prerequisite that the Pardon Board first recommend a prisoner for commutation. And this unfettered discretion precludes the possibility of an *ex post facto* violation arising from the changes to the commutation procedure Howard identifies.[4]

In *Garner*, the Supreme Court held that, "[w]hen [a] rule does not by its own terms show a significant risk, the respondent must demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its revocation will result in a longer period of incarceration than under the earlier rule." 529 U.S. at 255. The procedural changes upon which Howard's argument rests are several steps removed from proof that he now faces "a longer period of incarceration." *See id.* (analyzing whether changes to parole procedures increasing the time between reviews from "every three" to "at least every eight" years violated the *Ex Post Facto* Clause,

---

the same with respect to commutation procedures as it does to changes to parole procedures. *See also Morales*, 514 U.S. at 509.

[4] We recognize that "[t]he presence of discretion does not displace the protections of the *Ex Post Facto* Clause." *Garner*, 529 U.S. at 253. After analyzing the changes to Louisiana law and the facts of this case, however, we ultimately find the Governor's total discretion as to whether to grant commutation to a Board-recommended applicant is outcome determinative in this case.

reversing the appellate court's determination that this was a *per se* violation, and remanding for further proceedings); *Lewis-El v. Sampson*, 649 F.3d 423, 426 (6th Cir. 2011) ("According to the Supreme Court in *Garner v. Jones*, 'the relevant inquiry . . . is not whether the challenged [provision] is 'law' or whether the guidelines present a significant risk of increasing the plaintiff's maximum penalty, but rather whether the new guidelines present a significant risk of increasing the plaintiff's amount of time actually served,' *Michael v. Ghee*, 498 F.3d 372, 383 (6th Cir. 2007)[.]" (alterations in original)).  Being granted a hearing in no way secures a recommendation from the Board—indeed, the Board has declined to recommend Howard two times prior to the 2005 denial at issue here.  And even a recommendation from the Board in no way secures an actual grant of commutation from the Governor.  The Governor's ability to grant commutation to a prisoner recommended by the Board is entirely discretionary.  Notably, the Board has recommended that three separate Governors commute Howard's sentence, but none elected to do so.  This fact itself undermines Howard's argument that the new commutation procedure created a "significant risk" of increasing his punishment.

Furthermore, even a commutation does not secure an actual reduction in the time a prisoner must serve.  A commutation means only that a prisoner is eligible for parole—it says nothing about *when* or even *if* he would actually be paroled.  *See Solem*, 463 U.S. at 302-03 ("[E]ven if Helm's sentence were commuted, he merely would be eligible to be considered for parole.  Not only is there no guarantee he would be paroled, but . . . Helm would have to serve three-fourths of his revised sentence before he would be eligible for parole [in South Dakota], § 24-15-5[.]"); *Cal. Dep't of Corrections*, 514 U.S. at 509 (finding a change in California law regarding the frequency of parole hearings created "only the most speculative and attenuated risk of increasing the measure of punishment").  Thus, even evidence that receiving a commutation has become

more onerous, when present, does not definitively lead to the conclusion that a prisoner faces a "significant risk" of an increased period of incarceration.

Other circuits have addressed similar challenges to commutation procedures and come to the same conclusion. The Sixth Circuit, for example, evaluated a case in which the Michigan Parole Board abandoned a grid system previously in use to determine when a prisoner would be eligible for commutation. Under that system, the prisoner claimed, the parole board generally recommended commutation after expiration of the number of years prescribed by the grid. *Lewis-El*, 649 F.3d at 424. The new policy, however, set out a schedule for determining commutation eligibility in which prisoners were first interviewed after ten years, with reviews every five years after that. *Id.* The court ultimately noted

> The decision to commute a prisoner's sentence includes two layers of discretion: first, the parole board has discretion in its decision to recommend commutation; and second, the governor has discretion in his or her decision to commute the sentence. Lewis-El . . . failed to set forth any facts tending to show that he faces a significant risk of increased punishment *because of* Michigan's changed commutation provisions, or, specifically, because Michigan no longer adheres to the grid. In fact, this would be almost impossible to demonstrate considering the decision to commute a prisoner's sentence is so tied to the personal predilections of the person occupying the governor's office.

*Id.* at 427.

Similarly, the Third Circuit addressed alleged *ex post facto* violations deriving from an amendment to Pennsylvania law requiring that the Board of Pardons unanimously approve an applicant for commutation before the Governor be allowed to consider the applicant.[5] *Pa. Prison Soc'y v. Cortes*, 622 F.3d 215, 244 (3d Cir. 2010). The court concluded there was no viable claim that

---

[5] Pennsylvania voters voted to limit the Governor's clemency authority in this way. 622 F.3d at 244.

No. 11-30919

this amendment "raise[d] a 'significant risk' that commutations will be denied that otherwise would have been received," noting "the power to grant or deny commutations, as prescribed by the Commonwealth's voters, rests solely with the executive branch which may 'deny the requested relief for any constitutionally permissible reason or for no reason at all.'" *Id.* (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 467 (Brennan, J., concurring))).

Finally, the Eighth Circuit analyzed a case in which the parole board regulations initially required interviewing felons to determine commutation eligibility five years after incarceration, then at ten, thirteen, and fifteen years post-confinement, and annually thereafter, but were altered during the prisoner's incarceration to allow prisoners to apply for commutation not more than once every ten years. *Snodgrass v. Robinson*, 512 F.3d 999, 1001 (8th Cir. 2008). Again, the Eighth Circuit concluded "[t]he unpredictability of a wholly discretionary grant of commutation . . . precludes Snodgrass from demonstrating that the changes in Iowa's law raise a 'significant risk' that she will be denied a commutation she otherwise would have received." *Id.* at 1002. We find the analysis of these three circuits to be persuasive, and similarly conclude that, in this case, Howard has insufficiently demonstrated a "significant risk" that he will endure a "longer period of incarceration" as a result of the amendments to Louisiana's commutation process. *Garner*, 529 U.S. at 255.

### III.

Because the ultimate decision of the Louisiana governor as to whether to grant or deny commutation remains entirely discretionary, Howard cannot establish an *ex post facto* violation by identifying alterations to the State's commutation procedure increasing the amount of time between when commutation applications may be filed and granting the Board authority to deny a full hearing to an applicant. Accordingly, the judgment of the district court is

AFFIRMED.